# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**MONA L. ROMERO,**

    **Plaintiff,**

vs.                                                                 **Civil No. 98-1415 MV/RLP**

**KENNETH S. APFEL, Commissioner**
**Social Security Administration,**

    **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.     Plaintiff, Mona L. Romero, (Plaintiff herein) filed an application for Supplemental Security Income Benefits (SSI) under title XVI of the Social Security Act on June 8, 1995, alleging that she had been disabled since April 10, 1995. (Tr. 53-55). Her application was denied at the first and second levels of administrative review (Tr.56-57, 63), and by an Administrative Law Judge (ALJ herein). (Tr. 13-16). The Appeals Council declined to review the ALJ's decision. (Tr. 3-4). Plaintiff's Complaint in this court contests the decision of the Commissioner of Social Security denying her claim. The matter is now before the court on Plaintiff's Motion to Reverse and Remand for rehearing.

2.     Plaintiff suffers from endometriosis, fibroid tumors and injuries she sustained in an automobile accident on March 13, 1995. She alleged that she suffers from monthly abdominal cramping, back and neck pain, and frequent, severe headaches. (Tr.28, 69, 77-79).

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

3.  In reviewing the Commissioner's decision to deny benefits, I examine the entire record "to determine whether the findings are supported by substantial evidence and whether the (Commissioner) applied correct legal principles." *Pacheco v. Sullivan*, 931 F.2d 695, 696 (10th Cir. 1991).

4.  To qualify for Supplemental Security Income disability benefits, a claimant must establish a severe physical or mental impairment which is expected to result in death or last for a continuous period of twelve months and which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A). The Commissioner has established a five-step evaluation process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir.1988)(discussing five- step disability test). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989).

5.  At step two of the sequential evaluation process, the ALJ determines whether a claimant has a severe impairment or combination of impairments, that is, an impairment or combinations of impairments which had more than a minimal effect on the ability to perform basic work activities. *Soc. Sec. Rul. 85-28.*

6.  The ALJ decided this case at step two. He found that Plaintiff's gynecological condition was not "severe," accepting that it occasionally caused significant pain and limitations (Tr. 14), and that impairments caused by Plaintiff's motor vehicle accident, her headache and TMJ, "ameliorated to a non-severe level within 12 months" of her alleged date of onset of disability. (Tr. 16).

7.  Plaintiff's medical treatment at the University of New Mexico Hospital ("UNMH" herein), documented complaints of painful menses prior to infertility surgery performed in March 1993. (Tr.

212). No complaint of pain was recorded during an evaluation one year later. (Tr. 154). On December 14, 1994, Plaintiff again sought medical assistance for pelvic pain. (Tr. 246). Diagnostic testing conducted that month disclosed an enlarging uterus. (Tr. 252). She was diagnosed as suffering from a leiomyomatous uterus[2] causing dysmenorrhea[3], and placed on a trial of medication. (Tr. 137). Plaintiff sustained injuries in an auto accident on March 13, 1995. (Tr. 69, 83-85). On May 8, 1995, she returned to UNMH seeking treatment for infertility, and complaining of heavy menses with cramping. (Tr. 89). She returned for follow up on her fertility work-up on June 5, 1995, and was placed on a thee month trial of medication. (Tr. 88). The medical record documents that she complained of pain, but does not provide any specifics as to severity. The last reference to Plaintiff's gynecological condition is found in a July 6, 1995, treatment note by family nurse practitioner Stapleton, who primarily saw Plaintiff for headache complaints. (Tr. 95). Nurse Stapleton documented mid-cycle menstrual bleeding and prolonged menstrual bleeding, but did not chart any associated complaint of pain. There is no evidence that any medical provider prescribed pain medication to treat Plaintiff's complaints of pelvic pain. No medical record confirms Plaintiff's testimony that she "missed a lot of work" because pelvic pain. (Tr. 32-33).

8.      The ALJ reviewed Plaintiff's medical treatment, as well as her prior written statements which did not claim functional limitations caused by her gynecological condition. (Tr. 14, referring to Claimant's disability report, Tr. 69). He found that

> While (Plaintiff) may occasionally suffer significant pain and limitations associated with her menstrual cycle, I cannot find that this condition imposes consistent, chronic

---

[2] Leiomyoma (fibroids), is a benign tumor derived from smooth muscle, most commonly of the uterus. Dorland's Medical Dictionary, p. 906 (1988).

[3] Dysmenorrhea is defined as "difficult and painful menstruation." Stedman's Medical Dictionary 433 (1982).

3

> or long-standing limitations which occur every month and significantly limit her ability to meet the attendance requirements of normal work. Thus, I conclude that (Plaintiff's) gynecological condition is not severe.

(Tr. 14).

9. Plaintiff suffered a cervical strain in a rear end collision on March 13, 1995, for which she received prescriptions for Norflex[4] and Motrin. (Tr. 83-85). She stopped taking Norflex after one week. (Tr. 100). She was treated over the next two months by Nurse Stapleton at First Choice Community Health Care Clinic (Tr. 93-107), and by a chiropractor, Scott Denbigh. (Tr. 70, 101). Throughout the time she was treated by nurse Stapleton, Plaintiff had normal neurological examinations, but complained of frequent daily headaches, photophobia, some nausea and difficulty sleeping.

10. Plaintiff quit her job as a file clerk for a bank on April 10, 1995, complaining of head, neck and back pain. (Tr. 69).

11. Plaintiff returned to Nurse Stapleton on April 27, complaining of severe temporal headache with photophobia. She also stated that she was sleeping poorly. (Tr. 98). She was tender to palpation in the left anterior temporal area, and was given an injection of Toradol[5] which decreased her pain after 30 minutes. She was advised to use Tylenol at the onset of her headaches. On May 11, Plaintiff reported to Nurse Stapleton that high doses of Tylenol had not helped, but that she did have lessening of her headache pain and better sleep after chiropractic manipulation. (Tr. 97). She

---

[4]Norflex is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute painful musculoskeletal disorders. 1998 Physicians' Desk Reference, p. 1531.

[5]Toradol is a nonsteroidal anti-inflammatory drug indicated for the short term management of moderately severe acute pain that requires analgesia at the opioid level. *Id*. at 2507.

4

was given a prescription for Doxepin[6], and advised to retry Motrin. When she returned to nurse Stapleton on May 25, she stated that she did not use Motrin because it upset her stomach. (Tr. 101). She also reported that the chiropractor thought a misalignment of her jaw might be contributing to her headaches. She complained that she still experienced headache on a daily basis, lasting 30-60 minutes. She had no crepitus noted on her temporal mandibular joint, but her jaw did not open symmetrically. Nurse Stapleton increased her dosage of Doxepin and scheduled a CT scan, which was normal. (Tr. 92). Nurse Stapleton also referred Plaintiff for a neurological evaluation at UNMH, which was performed by Dr. Hegland on July 10. (Tr. 86-87). He noted Plaintiff's complains of headaches with mild photophobia, occasional nausea but no vomiting, and mild back pain around her scapula on the right. Her back was non-tender on examination. She had a mild right facial droop associated with pain in her right temporal mandibular joint, but an otherwise completely normal neurological examination. (Tr. 87). Dr. Hegland recommended that Plaintiff increase her dosage of Doxepin, consider switching to Zoloft or Depakote as prophylactic therapy if the Doxepin failed, use hot and cold packs as needed, and return if needed. (Tr. 86-87)

12. When she returned to nurse Stapleton on July 19, Plaintiff reported that she had increased her Doxepin and was sleeping "a little better." (Tr.94). She still complained of daily headaches. Three weeks later she requested a referral to physical therapy (Tr. 136) which was instituted on August 17. Findings on initial physical therapy evaluation were consistent with TMJ problems, and also demonstrated decreased and painful range of cervical motion and possible facet joint involvement. A four week program of physical therapy was instituted, with goals of increasing cervical range of

---

[6]Although not specifically indicated in the Clinicedical records, it appears Doxepin was prescribed as a sleep medication. (See e.g., Tr. 147).

motion in pain free range, home exercises and continued assessment of the TMJ and facet joints. (Tr. 109). At the time of her last recorded physical therapy appointment on September 5, 1995, Plaintiff stated that she had felt much better following her last treatment, with no headache until late the day after that treatment. The therapist noted that she was progressing well, having met her first set of therapy goals. (Tr. 108).

13. The remainder of Plaintiff's health care related to the injuries caused in the auto accident was obtained from from her dentist, Daniel Clifford, D.D.S, whom she saw five times over a 13-week period. (Tr. 140-147, 258). Dr. Clifford performed a TMJ consultation/evaluation on October 13, 1995. She complained of headaches, photophobia, neck, shoulder and upper back pain and ringing in her ears. (Tr. 141, 146). She told Dr. Clifford that she took Advil for her headaches, which helped after 20-30 minutes, and Doxepin in the evenings, which helped a little with sleep. ( Id.). Based on physical examination findings, Dr. Clifford diagnosed internal derangement and capsulitis of the right TM joint, cephalgia, MDP, and cervicalgia. (Tr. 142). He instituted a treatment regimen that included a mouth splint, TENS unit, heat packs, and trigger point injections. (Tr. 141, 144-145, 258). As of December 14, 1995, Dr. Clifford indicated that he could not determine how long he could recommend continuing with this conservative treatment regimen, but stated that if Plaintiff was not significantly improved in three months, he could consider referring her for surgical evaluation. (Tr. 140). At the time of Plaintiff's last recorded visit with Dr. Clifford on January 3, 1996, nine months after alleged date of onset, she complained of jaw pain and headache, but also indicated she had not been wearing her splint. (Tr. 258).

14. No additional medical evidence was submitted to the ALJ following the February 7, 1996, hearing, nor was any presented the Appeals Council. Plaintiff does not contend that the ALJ failed

6

to adequately develop the record. (*Memorandum in Support of Motion to Reverse and Remand for a Rehearing,* p. 3, Docket No. 7).

15. In a decision dated August 30, 1996, the ALJ determined that the medical evidence documented normal findings related to Plaintiff's head and neck, mild findings related to her jaw, significant improvement in her symptoms when recommended therapy was appropriately used, and that Plaintiff only utilized over the counter medicine for treatment of her pain. (Tr. 15). He also stated that her treatment record indicated that her functional limitations and headaches were expected to improve with short-term treatment. (*Id.*).

16. I find that substantial evidence supports that ALJ's decision, and that he applied the correct legal principles in the evaluation of Plaintiff's gynecological impairment, and the impairments caused by her motor vehicle accident.

17. A disability claim may be denied at step two only if an impairment, or combination of impairments, produces no more than a minimal effect on the claimant's physical and/or mental ability to do basic work activities. *Soc. Sec. Rul. 85-28.* "If such a finding is not clearly established by medical evidence, ... adjudication must continue through the sequential evaluation process." *Id.*; *see also Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988) (holding that if a claimant presents medical evidence which constitutes a mere "*de minimis*" showing of severity, the ALJ must proceed to step three). However, the claimant "must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). It is permissible for the ALJ to deny benefits at step two after considering only the medical evidence presented. *Bowen v. Yuckert*, 482 U.S. 137, 148, 151 (1987).

18. Plaintiff proved the existence of a pain producing gynecological condition and a pain

producing abnormality of her TM joint. Nonetheless, substantial evidence supports the ALJ's conclusion that her gynecological condition did not prevent her from engaging in basic work activities. She never required prescription medication for gynecological pain, and had maintained a job as a file clerk or as an assembly line worker and worked despite that condition until a separate injury occurred. Substantial evidence also supports the ALJ's conclusion that the injuries resulting from the March 13, 1995, auto accident had "ameliorated" to a non-severe level within twelve months after her April 10, 1995 onset date. Again, Plaintiff did not require prescription pain medication. She did respond to physical therapy, reporting a decrease in pain. A conservative regimen of treatment was established for her by her dentist. Had that approach not resulted in significant improvement within three months (approximately March, 1996), she was to be referred for surgical consultation. There is no medical evidence that any such consultation was obtained.

**Recommended Disposition**

19. Accordingly, I recommend that Plaintiff's Motion to Reverse and Remand for Additional Proceedings be denied, and that the decision of the Commissioner denying Plaintiff's application for Supplemental Security Income benefits be affirmed.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE